# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **WENDELL NEUBERT,** | ) | **CASE NO. 5:10CV1972** |
| | ) | |
| Plaintiff, | ) | **JUDGE SARA LIOI** |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION &** |
| **LIFE INSURANCE COMPANY OF** | ) | **ORDER** |
| **NORTH AMERICA,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on cross-motions for judgment on the administrative record filed by plaintiff Wendell Neubert ("plaintiff" or "Neubert") (Doc. 10) and defendant Life Insurance Company of North America ("defendant" or "LINA") (Doc. 11). Plaintiff asks the Court to overturn defendant's decision to discontinue his Long Term Disability ("LTD") benefits, and to either reinstate his LTD benefits or remand to defendant for a full and fair determination of his right to continued benefits. Defendant asks the Court to affirm the denial of benefits. The parties have filed opposition briefs (Docs. 12, 13) and reply briefs (Doc. 14, 15). This matter is ripe for disposition.

Also before the Court is a motion by plaintiff to strike part of defendant's argument that refers to evidence outside of the administrative record, and to deny defendant's request for judicial notice of the same. (Doc. 16.) Defendant has filed an opposition to the motion to strike (Doc. 17) and this matter is also ripe for disposition.

For the reasons that follow, plaintiff's motion to strike is **DENIED**, plaintiff's motion for judgment on the administrative record is **GRANTED in part** and defendants' motion for judgment on the administrative record is **DENIED**.

## I.    BACKGROUND

Plaintiff Wendell Neubert is a fifty-year-old former Aeronautical Project Engineer for Lockheed Martin Corporation ("Lockheed"). (Administrative Record ("AR") 15.) (Doc. 9.) Neubert participated in the Lockheed Martin Long Term Disability Insurance Plan (the "Plan"). The Plan is an employee benefit plan regulated by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002, *et seq.* Under the Plan, Neubert was covered by an insurance policy issued by LINA that provided disability benefits. LINA is also the Plan Administrator and is responsible for reviewing and processing claims, administering the Plan, and paying benefits under the Plan.

The Plan provides the following definition of disability:

> For purposes of coverage under the Policy, you are Disabled if, because of Injury or Sickness, you are unable to perform each and every material duty of your regular occupation. After Monthly Benefits have been payable for 24 months, you are Disabled if your Injury or Sickness makes you unable to perform all the material duties of any occupation for which you may reasonably become qualified based on education, training or experience.

(AR 571.) Before benefits will be paid under the Plan, LINA requires that a participant provide it with "satisfactory proof" of his or her disability. (AR 574.) Additionally, the Plan provides that LINA has the authority, in its discretion, to interpret the Plan's terms, and to determine eligibility for coverage or benefits. (AR 584.)

The Plan provides that disability benefits terminate when a participant earns more than 80% of his or her covered earnings, which are defined as a participant's wage or salary as reported by Lockheed, or when a participant returns to active service, is no longer disabled, dies, or when the maximum benefit period ends. (AR 571, 574.)

2

On March 24, 2006, Neubert suffered a stroke and was unable to continue working for Lockheed. (AR 3, 15.) On April 10, 2006, Neubert suffered a second stroke. (AR 15, 313.) On July 25, 2006, Neubert tried to return to work part-time without success due to self-reported stress, anxiety, an inability to concentrate or multitask, memory problems, fine motor difficulty and sensitivity to noise. (AR 345, 403.)

On July 31, 2006, Neubert applied for disability benefits from the Plan. (AR 962.) According to the Proof of Loss form filed by Neubert, he was suffering from an inability to "think and focus on tasks, plus other stroke damage." (AR 962.) Specifically, he reported a constant burning pain in his right arm and leg, fatigue, neck pain, memory loss, stress and anxiety, difficulty multitasking, slower thinking, and noise sensitivity. (AR 964.)

On September 1, 2006, Neubert saw Dr. Catherine Wilde for anxiety and stress. (AR 344.) She noted that Neubert was "clearly anxious" and that he feared the stroke caused cognitive problems that made it impossible for him to do his job. Specifically, he reported an inability to concentrate, sensitivity to noise, fatigue and difficulty making decisions. Dr. Wilde suggested that Neubert return for neuropsychological screening to clarify whether his complaints were organic, emotional, or caused by a combination of factors. (AR 347.) She diagnosed Neubert with adjustment disorder with mixed emotional symptoms and emotional changes secondary to stroke. (*Id.*) Finally, she noted that Neubert was resistant to psychotherapy. (*Id.*)

On November 7, 2006, LINA approved Neubert for LTD benefits retroactive to October 10, 2006. (AR 230.) Neubert continued to see a neurologist after he received LTD benefits. (AR 312.)

In April 2007, Neubert was admitted to the hospital for a possible third stroke. (AR 266.) On April 9, 2007, neurologist Dr. Robert Lada examined Neubert and found that he was alert, had normal memory, knowledge, cognition, attention, speech and language, but noted a drift on Neubert's right side, decreased fast finger movements, decreased pin vibratory, hot and cold sensation on the right side, increased reflexes on his right side, and weakness on the right side with a hemiparetic gate. (AR 271-72.) Dr. Lada reviewed the results of an MRI and opined that Neubert had suffered a mini-stroke. (AR 267.) Neubert was discharged from the hospital on April 10, 2007 with no restrictions other than to engage in activity "as tolerated." (AR 278.)

On April 28, 2008, LINA sent Neubert a letter notifying him that it had begun a review of his file to determine his continued eligibility to receive LTD benefits after October 10, 2008, the date upon which the definition of disability applicable to his claims would change. (AR 180-81.) LINA requested updated information from Neubert and his treating physicians and indicated that upon receipt of the information, it would compare his restrictions and limitations to his training, education, and work experience. (*Id*.)

The parties agree that there is no dispute about Neubert's disability during the first 24-month period in which he received benefits. As outlined above, the Plan defines disability during this period as an inability to perform each and every material duty of the participant's regular occupation. After twenty-four months of benefits, however, the Plan definition of disability changes to an inability to perform all the material duties of any occupation for which the participant may reasonably become qualified based on his or her education, training or experience. The parties dispute whether Neubert remained eligible for

LTD benefits under the Plan once this latter definition became applicable to his claim. The following facts are relevant to this determination.

On May 15, 2008, Neubert completed a Disability Questionnaire, stating that the primary physical or mental conditions preventing him from working were an inability to focus, burning pain in his arm and leg, fatigue and lack of stamina, neck pain, stress, and memory problems, all because of "permanent stroke damage." (AR 843-47.) He reported the following regular activities: a half hour of cooking a day, one to two hours of shopping once a week, fifteen minutes of laundry twice a month, one to two hours of gardening or yard work twice a week, walking on the treadmill or lifting weights three to four times a week, and watching television three to four hours a day. (*Id*.) He stated that he did not engage in outside activities and was mostly house bound with the exception of walking a half-mile for twenty minutes four times a week. (*Id*.)

On September 24, 2008, Neubert's primary care physician, Dr. Elizabeth M. Salay, completed an Attending Physician's Statement of Disability ("PSD"). (AR 824.) Dr. Salay reported that she began treating Neubert in March 2006 and that she saw him four times a year. (*Id*.) The PSD noted a diagnosis of hemiparesis, vertebral artery dissection, and history of stroke without residual deficits. (*Id*.) The reported subjective symptoms were weakness and memory disturbance. (*Id*.) The PSD noted that Neubert's progress was unchanged and that, "he has had maximal therapy for his medical illness." (*Id*.) In the prognosis section, Dr. Salay indicated that Neubert was totally disabled from any work due to impaired fine motor skills, memory and word finding problems, and balance problems. (*Id*.) She stated that she did not expect his condition to improve in the future, nor did she expect that he would be capable of working any job in the

future because the symptoms from his previous stroke were "not likely to resolve." (*Id*.) Dr. Salay also noted that Neubert was not a suitable candidate for medical rehabilitation, that no job modifications would enable him to work with his impairment, and she recommended against vocational counseling and/or retraining. (*Id*.)

On November 9, 2008, Neubert completed an updated Disability Questionnaire, stating that the primary physical or mental conditions preventing him from working were constant burning in his right arm and leg, severe neck pain, anxiety, inability to focus or multitask, memory problems, and fatigue. (AR 769.) Neubert noted the following regular activities: a half hour of cooking a day, a half hour of cleaning three times a week, one to two hours of shopping once a week, fifteen minutes of laundry twice a month, one to two hours of yardwork or gardening twice a week, twenty minutes of walking one to two times a week, and lifting weights or walking on a treadmill three to four times a week. (AR 769-70.) He also noted that he had an application pending for social security disability benefits. (AR 771.)

On November 19, 2008, Neubert saw Dr. Dipti Shah, his new primary care physician. (AR 401.) Dr. Shah's examination notes indicate that Neubert reported residual symptoms from his previous strokes, including weakness, burning in his right arm and leg, fine motor skill difficulties, trouble concentrating, anxiety, limited cognitive function and memory problems. (AR 403.) He opined that Neubert was permanently disabled. (*Id*.) Dr. Shah's primary diagnosis of Neubert was cerebrovascular accident with residual cognitive deficit. (AR 404.)

On November 20, 2008, Dr. Shah submitted a PSD form (AR 736-37) to LINA, which was later updated by a Physical Ability Assessment form ("PAA") (AR 703-04). Dr. Shah indicated in the PSD that he took over treatment of Neubert from Dr. Salay on November 19,

2008. (AR 736.) The PSD noted diagnoses of stroke, Type 2 diabetes mellitus, hemiparesis, hyperlipidemia and hypertension. (*Id*.) Dr. Shah reported Neubert's subjective symptoms to be residual weakness, burning in his right leg and arm, and memory problems. (*Id*.) The PSD also noted: "patient has cognitive function." (*Id*.) The response to the objective findings section of the PSD was marked, "NA." (*Id*.) Finally, in the remarks section, Dr. Shah noted: "patient is totally disabled." (AR 737.)

Dr. Shah's PAA, which updated the PSD, indicated that Neubert can frequently sit, reach, grasp, lift 10 to 20 lbs., carry 10 lbs., push 25 lbs., pull 25 lbs., and can occasionally stand, walk, use fine manipulation, lift 21 to 100 lbs., carry 11 to 100 lbs., climb stairs, stoop, kneel, crouch, crawl, and has difficulty with fine motor activities, balancing, working extended shifts, using his feet for foot controls, and cannot work around machinery. (AR 707-08.) Dr. Shah noted that "patient has more problems with cognitive ability than physical ability because of stoke." (*Id*.)

On January 12, 2009, at the request of LINA, Neubert underwent an independent neuropsychological evaluation with a neuropsychologist, Dr. Thomas Swales. (AR 712-25.) Dr. Swales interviewed Neubert and reviewed his laboratory reports and medical records, including the treatment notes and physician statements from his doctors. (*Id*.) Neubert described to Dr. Swales that he suffered from burning pain in his right leg, an inability to feel temperature, neck pain, fatigue, difficulty focusing, stress, anxiety, and an inability to multitask. (AR 714.) The report stated that, during the interview, Neubert described himself as "a workaholic" and described his daily activities since leaving his job due to his strokes, including mowing his lawn, gardening, having dinner with friends or family once a month, and spending most of his time

playing "World of Warcraft." (AR 713-15.) According to Dr. Swales's report, "He reportedly shoots a button over and over in a repetitive action," and Neubert told him, "I talk to people on a headset. I get a sense of accomplishment." (AR 715.)

Dr. Swales administered a battery of tests to evaluate Neubert's cognitive function. Of the intelligence testing, Dr. Swales noted that Neubert scored in the ninth percentile on the coding subtest, which he characterized as Neubert's "worst performance, in the borderline range, [...] which reflects a slow speed of rapid copying of symbols paired with numbers." (AR 720.) Dr. Swales concluded that Neubert's memory and spatial skills were in the very superior range; his verbal and nonverbal intelligence, confrontational word naming, working memory, and list learning were in the high average range; and his attention/vigilance, frontal systems, memory for stories, nonverbal memory and speed visual-motor processing were in the average range. (AR 722.) Of the motor skills testing, Dr. Swales found that Neubert's fine motor coordination and grip strength were uniformly in the low average range in his dominant hand, most likely due to "some residual weakness" because of his stroke. (AR 721.) The results of emotional testing revealed that Neubert was experiencing mild to moderate emotional distress characterized by tension, anxiety, and dysphoria. (*Id*.) Dr. Swales's report indicated that Neubert put forth adequate cooperation and effort throughout the tests and that there was no indication of malingering. (AR 719, 721.)

Based on his examination of Neubert, Dr. Swales concluded that Neubert was free of cognitive disorders and performed in the average to high average range in cognitive functioning.[1] (AR 722.) The only meaningful finding, according to Dr. Swales, was that

---

[1] Specifically, Dr. Swales rated as intact or above average Neubert's ability to "carry out activities of daily living;

Neubert's fine motor coordination and grip strength were in the low average range in his dominant hand, which Dr. Swales concluded correlated with his history of stroke. (*Id.*) In Dr. Swales's opinion, Neubert's "primary problems appear to be affective (psychiatric in nature) in that he is struggling with anxiety, characteristic of a generalized anxiety disorder," but he also opined that "the intensification of anxiety following his stroke would indicate that it is possible there may be also some organically-based component to his anxiety, as a consequence of his cerebellar stroke." (AR 724.) He concluded, further, that "[Neubert's] cognitive complaints appear to be the product of anxiety, rather than true cognitive impairment. Overall, his cognitive capacity appears at the best estimated level of his prior premorbid functioning while working, based upon his performance on a variety of cognitive measures in this neuropsychological evaluation." (AR 725.) According to Dr. Swales, Neubert "appears free of any cognitive impairment currently that would preclude a return to gainful employment." (AR 724.)

On February 19, 2009, LINA's vocational department completed a Transferrable Skills Analysis ("TSA"). (AR 699.) LINA noted that Neubert's past work experience was as a senior staff project engineer and identified his annual salary as $96,669. (*Id.*) The TSA designates a wage requirement of $58,001.40, which the parties agree represents 60% of Neubert's past salary. (*Id.*) According to the TSA, the restrictions identified by Dr. Shah were as follows:

---

his ability to focus and concentrate; short term memory; working memory; comprehension; intellectual capabilities; problem solving capabilities; higher level executive functioning; ability to deal with change; ability to multitask; ability to understand; carry out, and follow instructions; ability to respond appropriately to instructions and questions; ability to persist and maintain pace; ability to plan and sustain activities; ability to influence other people's opinions, attitudes, and judgment; and, ability to exercise brood judgment and make decisions. It is also important to note that his ability to deal with everyday stressful situations, despite his anxiety, appears intact, as well as his ability to function socially and relate interpersonally to others." (AR 723.)

> Occasionally: lift 21-100 pounds, carry 21-100 pounds, fine manipulation bilaterally, stand, walk, climb stairs, stoop, kneel, crouch, crawl, exposure to extremes in heat and cold, exposure to wet and humid conditions, exposure to vibration, exposure to odors, fumes and particles; (2) Frequently: sit, reach in all directions, simple grasping bilaterally, firm grasping bilaterally, lift 20 pounds, carry 20 pounds, push 25 pounds, pull 25 pounds; (3) Continuously: see, hear, smell, taste; and (4) Unable: work around machinery.

(*Id*.) The TSA noted that Dr. Shah observed that Neubert "has more problems with cognitive ability than physical ability because of stroke." (*Id*.) Based on Neubert's work history, his skills and abilities, and the wage requirement, without consideration of any cognitive deficits, the TSA identified the following 'light duty' occupations: (1) sales engineer, aeronautical products; (2) project engineer; and (3) production planner. (AR 700.)

The same day that LINA completed its TSA, it issued a denial letter to Neubert terminating his LTD benefits. (AR 162.) The letter set forth the Plan's definition of disability and outlined the information that LINA reviewed. (*Id*.) First, the letter cited Dr. Shah's PAA form completed November 26, 2008, noting that Neubert had more trouble with his cognitive ability than his physical ability. (AR 163.) The letter also summarized Dr. Swales's report, stating that he had not found "any major cognitive limitations or impairments that would be sufficient to remove or preclude the option of returning to gainful employment[.]" (*Id*.) Next, the letter cited the TSA, which LINA stated identified occupations comparable with Neubert's work capacity and that satisfy the earnings requirement for his indexed covered earnings under the Plan. (*Id*.) The letter then outlined the appeal procedures applicable to the denial of benefits. (AR 163-64.)

On August 7, 2009, Neubert appealed LINA's denial of LTD benefits. (AR 749.) LINA sent Neubert's counsel a letter acknowledging the appeal and requesting any additional

information that would influence the appeal decision. (AR 160-61.) Neubert subsequently submitted additional medical records.

Included in the additional information provided was information relating to a March 20, 2009 general neurology follow-up Neubert had with Dr. Karla J. Madalin. (AR 381.) The subjective part of Dr. Madalin's exam findings indicated that Neubert was experiencing severe pain in his right leg and the right side of his neck, difficulty focusing and multi-tasking, increased fatigue, confusion, and slowness of thinking. (AR 384.) Her objective medical findings indicated that Neubert's recent and remote memory was intact, his fund of knowledge was normal, his attention span and concentration normal and he had decreased sensitivity in his right extremities. (AR 390-91.) Dr. Madalin diagnosed Neubert as follows: (1) thalamic syndrome, noting that the "significant discomfort" and pain in his right arm and leg were due to his previous strokes; (2) stroke with residual cognitive deficit, noting that he had residual right hemisensory deficit and neurogenic pain; (3) hemiparesis, noting a right hemisensory deficit from his previous strokes; (4) vertebral artery dissection, noting a stable occlusion of the left vertebral artery. (AR 391-92.) She concluded that there was no "objective test to determine the cause of [Neubert's] inability to work," and she stated she believed "that as a consequence of [his] stroke, [he was] unable to work in [his] previous job or any job." (AR 392.)

Information was also provided regarding an April 7, 2009 follow-up exam that Neubert had with Dr. Shah. (AR 375.) Neubert complained that his right foot had turned red and blue for the past two years, and that he was experiencing burning pain on his right side. (AR 377.) Dr. Shah's objective findings noted that Neubert spoke fast and was very anxious; his right foot was red/blue; no acute neuro deficits; equal bilateral strength; and impaired fine motor

11

skills. (AR 378.) She diagnosed Neubert with hypertension, stroke with residual cognitive deficit, hyperlipidemia, thromboangiitis obliterans, anxiety disorder, Type II diabetes, controlled, hemiparesis, vertebral artery dissection, and pulmonary nodule. (AR 378-79.) She indicated that she was referring Neubert to the vascular surgery department. (AR 379.)

Information was also provided regarding an August 24, 2009 neuropsychological evaluation performed by Harold S. Schaus, Jr., M.S., DAPA. (AR 252.) Mr. Schaus indicates in his report that he reviewed Neubert's medical records, his job description and Dr. Swales's neuropsychological evaluation. (*Id*.) After reviewing Neubert's background, Mr. Schaus was critical of Dr. Swales's report, indicating that it lacked testing of divided attention, "or being able to keep more than one thing in mind at a time." (AR 253.) Mr. Schaus's report states that, "[t]his aspect of attention is crucial in assessing [Neubert's] complaints about troubles multitasking, and is one of the most common deficits anytime there has been an insult to cortical tissue." (*Id*.) Mr. Schaus selected tests based on this observation and Neubert's complaints about intolerance to noise and anxiety. (*Id*.)

Mr. Schaus's report indicates that cognitive deficits were evidenced by the results of two tests: the Paced Auditory Serial Addition Test (PASAT) and the Integrated Variables of Attention (IVA), which assess multitasking and auditory functioning. (AR 255.) On the four series in the PASAT, Neubert scored in the 9th, 21st, 24th, and 13th percentiles respectively. (AR 254.) On the IVA, Neubert performed in the average range on the visual subtests, but Mr. Schaus noted that he had "significant problems" with the auditory portion. (*Id*.) Mr. Schaus stated: "There is no question about some cognitive deficits given the results of the PASAT and the IVA. These cognitive deficits alone would make it unlikely that Mr. Neubert could adequately perform

his former job." (AR 255.) Mr. Schaus observed that Neubert's cognitive deficits were compounded by emotional factors. (*Id*.)

Based on these findings, Mr. Schaus diagnosed Neubert with generalized anxiety disorder, adjustment disorder with depressed mood, dependent personality traits, schizoid personality traits, avoidant personality features, obsessive compulsive personality features, cognitive disorder (not otherwise specified), illness or fatigue, moodiness, and a GAF score of 70. (AR 255-56.) He found no evidence of malingering and concluded:

> Mr. Neubert is unable to return to his previous job or one approximating the level of difficulty required on his former job. The cognitive deficits alone make it unlikely that he could resume his previous employment. Add the emotional problems and it is a real long shot that he could resume his duties at Lockheed.

(AR 256.)

On September 22, 2009, LINA notified Neubert by letter that it had determined that it would need two Independent Peer Reviews in order to evaluate Neubert's disability claim. (AR 155.) On October 8, 2009, Dr. Linda Miller, an internist, completed a file review at the request of LINA. (AR 470.) She concluded that the medical information provided did not show any measured limitations that would support off work restrictions from February 20, 2009 onward. (AR 476.) Dr. Miller states that, "Numerous clinic visits state that [Neubert] has no residual from [his strokes] except possible patchy decreased sensation in the right [arm] and complaints of burning pain on the right. There are no measured limitations on any of his physical exams." (*Id*.) Dr. Miller indicated that she did not evaluate Neubert's cognitive or psychiatric complaints because that was not her area of expertise. (AR 477.) Finally, she noted that she spoke with Neubert's treating physician, Dr. Shah, who, according to Dr. Miller, indicated that

Neubert had no physical limitations or restrictions, but was unable to work due to anxiety and problems with comprehension. (*Id*.)

On November 12, 2009, at the request of LINA, Dr. Elana Mendelssohn, Psy. D., completed a file review. (AR 462.) She opined that "the provided clinical information both based on review of documentation and a peer-to-peer consultation did not support the presence of a functional impairment from a neuropsychological perspective nor does this information support off-work restrictions by the measured limitations from 02/20/2009 forward." (AR 465.) Dr. Mendelssohn reported that she spoke with Neubert's treating physician, Dr. Shah, and stated that Dr. Shah "was unable to provide [a] specific description of overt cognitive difficulties[,]" and that Dr. Shah "noted the claimant's report of multiple cognitive problems and that the claimant tended to present as anxious with fast speech." (AR 465.) Dr. Mendelssohn found that the records "did not include [a] clear description of direct and observed behaviors to corroborate" Neubert's claimed impairments. (*Id*.) Further, she disagreed with Mr. Schaus's report and indicated that Neubert's performance on the tests administered by Mr. Schaus "did not substantiate the claimant suffers from global impairment in neuropsychological functioning." (*Id*.)

In the meantime, on October 22, 2009, Neubert was awarded Social Security disability benefits. (AR 590.) The ALJ found that Neubert was disabled since March 23, 2006 due to severe impairments; specifically, post left cerebellar and left medullary stroke and the effects thereof. (AR 596.) This "medically determinable impairment," as found by the ALJ, equals listing 12.02. (*Id*.) The ALJ concluded that Neubert's "impairments could reasonably be expected to produce the alleged symptoms," and his "statements concerning the intensity,

14

persistence and limiting effects of these symptoms are generally credible." (*Id*.) Neubert notified LINA of the SSA award.

On November 23, 2009, LINA issued its second denial letter to Neubert affirming its earlier decision to terminate his LTD benefits. (AR 150.) The letter stated that LINA's decision was based upon the Plan language and its review of Neubert's file as a whole. (*Id*.) LINA then summarized the findings of its file reviews and agreed with their findings that the "documentation provided for review [did] not show any measured limitations [on any of Neubert's physical exams] that would support the off work restrictions from February 20, 2009 forward." (AR 150-51.) Specifically, LINA noted that numerous clinic visits stated that Neubert had "no residual from [his stroke] except possible patchy decreased sensation in [his right arm] and complaints of burning pain on [his right side.]" (AR 151.)

Next, the letter said that, "although the documentation on file shows the presence of high levels of anxiety, the information available for review and telephone conversation[s] with [Neubert's] treating provider did not include clear description of direct and observed behaviors to corroborate the presence of impairment in emotional or behavioral functioning." (*Id*.) LINA also cited Dr. Swales's finding that there was no indication that the reported anxiety affected his ability to complete cognitive tasks. (*Id*.) LINA then acknowledged the subsequently administered tests of divided attention by Mr. Schaus, who concluded that Neubert demonstrated cognitive deficits, but stated that, in its peer reviewer's opinion, Neubert did not suffer from a "global impairment in neuropsychological functioning." (*Id*.) The letter concluded that, "[b]ased on the results of the medical reviews of Mr. Neubert's physical and mental health conditions, the records on file do not provide medical documentation to support the severity of any of his

conditions or impairments of his functional abilities that would prevent him from performing any occupation as the results of the [TSA] of February 2009 remain valid." (*Id.*) Again, LINA closed the letter by outlining its appeals procedure and inviting Neubert to submit additional documentation. (*Id.*)

On February 1, 2010, Neubert appealed LINA's second denial. (AR 455.) On April 27, 2010, LINA acknowledged receipt of Neubert's appeal by letter. (AR 145.) By letter dated March 11, 2010, LINA responded to a fax of Neubert's counsel, indicating that it had reviewed all the evidence in his file, including "37 exhibits you submitted for Mr. Neubert's initial appeal," prior to its second denial of LTD benefits. (AR 149.)

On May 24, 2010, Dr. Scott Taylor, LINA's associate medical director, completed a file review. (AR 243.) He concluded:

> Overall, in the absence of other documentation, it is my opinion, with a reasonable degree of medical certainty, that the medical records reviewed do not provide documentation of sufficient physical or cognitive functional deficits by clinically measurable testing to support restrictions indicated by the treating physician or inability to perform sedentary work activities from 02/10/09 forward.

(*Id.*)

On June 16, 2010, LINA issued its third and final denial letter of Neubert's claim for LTD benefits. (AR 142.) LINA's letter stated that it reviewed Neubert's complete file "without deference to prior reviews." (AR 143.) LINA then indicated that it referred his file to its associate medical director to review the medial documentation, and he noted that Dr. Shah's physical exams did not reflect sufficient physical deficits to preclude performance of sedentary activities and did not support, with documented testing, the doctor's finding of impaired fine motor skills. (*Id.*) Turning to Neubert's cognitive function, the letter stated that the medical

16

director noted that Dr. Swales's report found no major cognitive limitations; that peer review of Mr. Schaus's report did not find evidence of measured limitations to support off work restrictions; and that a second peer review did not find "overall global impairment." (*Id*.) Finally, LINA concluded that the medical records did not provide sufficient "clinically measurable testing to support restrictions" that would prevent Neubert from "continuously performing the material duties of any occupation." (*Id*.)

On September 3, 2010, Neubert filed this action for wrongful denial of benefits. Both parties have filed motions for judgment on the administrative record. Neubert argues that defendant's decision to terminate benefits was arbitrary and capricious, as evidenced by its disregard of critical, relevant evidence, a failure to follow the Plan, and a conflict of interest created by its dual roles as plan administrator and insurer. (Docs. 10, 12, 14.) LINA contends that its decision is supported by substantial evidence in the administrative record and that it followed a deliberate and reasoned process in reaching its decision to terminate Neubert's LTD benefits. (Docs. 11, 13, 15.)

## II.    LAW AND ANALYSIS

### A.  Motion to Strike

As a preliminary matter, the Court will address plaintiff's motion to strike. LINA argues that its decision is further supported by Neubert's admission that he routinely plays "World of Warcraft" on his computer. (Doc. 11-1 at 20-22; Doc. 15 at 4.) Defendant's brief describes World of Warcraft as a "multiplayer online role-playing game where players control a character that completes quests and fights monsters. Players can also talk to other players on headsets that are connected through the internet." LINA contends that this description contradicts

17

Neubert's assertions that he has difficulty with his fine motor skills and is unable to multitask. (Doc. 11-1 at 21-22) Specifically, LINA asserts: "If Mr. Neubert has the ability to play this game everyday [sic], it is clear that he has the ability to multi-task and use his fine motor skills as the game requires players to watch a computer screen and respond to multiple events occurring rapidly in the game by pressing various computer keys and/or moving the mouse all while communicating by headset." (*Id*. at 22.)

Plaintiff asserts that defendant's arguments and description of "World of Warcraft" are not found in the administrative record and that Neubert's ability to play this "kids' game" does not support LINA's denial of disability benefits. (Doc. 12 at 10.) Pursuant to Fed. R. Civ. P. 12(f)(2), Neubert moved to strike defendant's argument as outside of the administrative record. (Doc. 16.)

Defendant opposes the motion, arguing that it should be permitted to rebut plaintiff's erroneous description of the game, which is also outside of the administrative record. (Doc. 17.) LINA responds that its definition of the game is derived from Neubert's description (AR 715), and that this Court can take judicial notice of the game's guide available on its website. (Doc. 15.) Further, it refutes plaintiff's description of the game as a "kids' game" because the game is not appropriate for children due to its violent content, sexually suggestive themes, and the characters' use of alcohol. (Doc. 15 at 4.)

Under Fed. R. Civ. P. 12(f), a court may strike only material that is contained in the pleadings. Fed. R. Civ. P. 7(a) defines pleadings as "[…] a complaint; […] an answer to a complaint; […] an answer to a counterclaim designated as a counterclaim; […] an answer to a crossclaim; […] a third-party complaint; […] an answer to a third-party complaint; and […] if

18

the court orders one, a reply to an answer." Arguments contained in a dispositive motion are not "pleadings" within the meaning of Fed. R. Civ. P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f). *See Fox v. Mich. State Police Dep't*, 173 F. App'x 372 (6th Cir. 2006) (citing Rules 12(f) and 7(a)). Accordingly, plaintiff's motion to strike is **DENIED**.

While plaintiff's motion to strike is procedurally improper, the Court notes that plaintiff's arguments contained therein otherwise have merit. ERISA rules compel that this Court only consider the evidence that was presented to the plan administrator, subject to certain exceptions—none of which are at issue here. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 171 (6th Cir. 2007) ("Evidence outside the administrative record may be considered 'only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part.'") (quoting *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d 609, 618-19 (6th Cir. 1998)); *Perry v. Simplicity Eng'g, a Div. of Lukens Gen. Indus.*, 900 F.2d 963, 967 (6th Cir. 1990) ("If district courts heard evidence not presented to plan administrators, employees and their beneficiaries would receive less protection than Congress intended.")

Consequently, the Court **DENIES** defendant's request to take judicial notice of the "World of Warcraft" description available on the game developer's website and/or the Entertainment Software Rating Board's rating of the game—none of which appears in the administrative record nor was cited by LINA in its three disability determinations. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (noting a court is required to consider only facts known to the plan administrator at the time he or she made the decision).

Consequently, the Court will not rely upon the parties' arguments and factual assertions with regard to these materials.

**B.  Motions for Judgment on the Administrative Record**

**1.  Standard of Review**

The decision of an ERISA plan administrator to deny benefits is reviewed *de novo*, unless the benefit plan grants the administrator discretionary authority to determine eligibility for benefits or construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where there is a clear grant of discretionary authority to the plan administrator under the terms of the plan, the court applies an arbitrary and capricious standard of review to the administrator's decision to deny benefits. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994). In this case, the parties agree that the terms of the Plan clearly grant discretionary authority to LINA. Accordingly, the Court reviews LINA's decision to determine whether it was arbitrary and capricious.

Under the arbitrary and capricious standard, the Court must affirm the decision of the administrator if the record evidence establishes a reasonable basis for the decision. *Davis v. Ky. Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989). In the absence of a procedural challenge to the administrator's decision, the Court's review is limited to the administrative record of the benefit determination. *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501,511 (6th Cir. 2005). The Court must determine whether the administrator's decision was "the result of a deliberate, principled reasoning process and [...] is supported by substantial evidence." *Glenn v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) (citation omitted). The decision must have been rational in light of the plan provisions. *Shelby Cnty. Health Care*

20

*Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933-34 (6th Cir. 2000). The decision of the administrator will be upheld if the administrative record supports a "reasoned explanation" for the decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (citation omitted). The Court "must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants." *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004) (citation omitted).

The arbitrary and capricious standard of review is not, however, a mere rubber-stamp for the plan administrator's decision. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). "Deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (internal quotations and citations omitted). The court must "review [] the quality and quantity of the medical evidence and the opinions on both sides of the issues." *Id*. A decision based upon a selective review of the record or an incomplete record is arbitrary and capricious. *Moon*, 405 F.3d at 381. Additionally, indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith, a conflict of interest by the decision-maker, *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002), and the plan administrator's failure to give consideration to the Social Security Administration's (SSA) determination. *Glenn*, 461 F.3d at 666.

## 2. First Denial of Benefits

In its first letter terminating and denying LTD benefits, LINA noted that Neubert's treating physician stated that his limitations were chiefly cognitive, as opposed to physical, but denied disability based, in part, on the report of Dr. Swales, which failed to find any major cognitive impairments preventing Neubert from working. LINA also relied on its

21

vocational review, which it says identified comparable occupations that satisfy the earnings requirement under the Plan.

   Plaintiff argues that LINA's first denial of benefits was arbitrary and capricious for several reasons. First, plaintiff contends that LINA's reliance on Dr. Swales's independent examination was arbitrary and capricious because the specific testing he conducted did not support his conclusions, and he failed to consider that Neubert had worked in a highly skilled occupation, not just any gainful employment. When assessing a non-treating physician's opinion, the Court may consider several factors, including:

> (1) whether the reviewing physician has a conflict of interest; [...] (2) whether the administrator decided that the physician should conduct a file review rather than a physical exam […]; and (3) whether the non-treating physician's conclusion makes a critical credibility determination regarding a claimant's medical history and symptomology without observing the claimant.

*Houston v. Unum Life Ins. Co. of Am.*, 246 F. App'x 293, 301-02 (6th Cir. 2007) (internal quotations and citations omitted.)

   Applying these factors to Dr. Swales's opinion, the Court finds that it is supported by substantial evidence, and LINA's reliance thereon was reasonable. Dr. Swales conducted an independent evaluation of Neubert, which consisted of a clinical interview (AR 713-15), a neuropsychological evaluation and testing (AR 715, 718-22), his behavioral observations (AR 718) and a review of Neubert's medical records (AR 715-718). Plaintiff has not come forward with any evidence to show that Dr. Swales had a conflict of interest, or that any such conflict affected his opinion. Plaintiff takes issue with Dr. Swales's conclusions, but the testing upon which his opinion is based, with the exception of a select few results, overall shows that Neubert performed in the superior to average range in nearly all of his examinations. What is more, of

those tests that Neubert performed poorly on, the coding subtest and the card-sorting test (WCST) (AR 719-20), his performance was still in the "borderline" or "average" range (AR 720). Taken as a whole, Dr. Swales's conclusion that Neubert did not have any cognitive disorders or impairments is supported by substantial evidence. Accordingly, LINA's reliance on Dr. Swales's opinion was not arbitrary and capricious.

While LINA was entitled to give greater weight to the opinion of Dr. Swales, it was obliged to provide some explanation for adopting his opinion over those of Neubert's treating physicians, who each opined that Neubert was totally and permanently disabled. This it did not do. Instead, LINA's denial letter briefly outlines the Plan's definition of disability; cites an irrelevant provision of the Plan;[2] provides a cursory recitation of conflicting opinions of Dr. Shah and Dr. Swales and the findings of the vocational review; and concludes that Neubert "no longer meets the definition of [d]isability." (AR 162-64.) The letter is devoid of any meaningful analysis and, therefore, evidences a lack of deliberate, principled reasoning. *See Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 556 (6th Cir. 2008) (raising "serious concern" that denial letter failed to explain reasons for its decision where the letter set forth the standard of review, a list of records reviewed, and a single sentence explanation of the decision-making process); *Cox v. Cigna Group Ins.*, No. 09-82-JBC, 2010 WL 724640, at *2-3 (E.D. Ky. Feb. 24, 2010) (finding a denial letter lacked deliberate and principled reasoning where it recounted technical contents of medical records without any meaningful analysis and dismissed all of claimant's evidence of disability in a single sentence). This lack of explanation weighs in favor of finding that LINA's decision was arbitrary and capricious.

---

[2] Without explanation, the denial letter includes an excerpt from the Plan regarding the calculation of monthly benefits for any month an employee is residually disabled, which appears to have no relevance whatsoever to LINA's disability determination.

Next, plaintiff contends that LINA's termination of Neubert's benefits was due to a conflict of interest. The Sixth Circuit has recognized that a conflict of interest exists where, as is the case here, the insurer both decides whether the employee is eligible for benefits and pays those benefits. *Evans v. UnumProvident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (citing *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005)). When such a dual role is present, "the potential for self-interested decision-making is evident." *Id.* at 876 (citation omitted). "However, this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious." *Id.* (citing *Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston*, 419 F.3d 501, 506 (6th Cir. 2005)). The Court must look to see if there is evidence that the conflict in any way influenced the plan administrator's decision. *Id.* (citing *Carr v. Reliance Standard Life Ins. Co.*, 363 F.3d 604, 606 n. 2 (6th Cir. 2004)). Conclusory conflict allegations alone are not sufficient to establish that LINA's denial of benefits was arbitrary and capricious; plaintiff must also present evidence that the conflict influenced LINA's decision in some way. *See, e.g., Jackson v. Metropolitan Life*, 24 F. App'x 290, 292 (6th Cir. 2001) (citation omitted).

As evidence of LINA's conflict, Neubert points out that LINA issued its first denial letter on February 19, 2011, the very same day that it received the vocational review. He contends this demonstrates that the letter was either pre-written and the results of the vocational review were "plugged in," which evidences bad faith, or the letter was completed just hours after the vocational review was submitted, which shows a lack of "deliberate principled reasoning." *Evans*, 434 F.3d at 876. LINA admits that it *signed* the denial letter the same day that it received

the vocational review, but argues that the review was just over one page in length and, presuming it did not contain information dramatically conflicting with the record, LINA could easily have read the TSA and finalized the letter. (Doc. 13 at 13.)

Defendant is required to provide a "full and fair review" of plaintiff's claim, *Bruch*, 489 U.S. at 113. The timing of LINA's denial in relation to its receipt of the TSA certainly implies that LINA had already made up its mind before it even received the vocational review. Moreover, several unexplained discrepancies contained in the vocational review offer cause for concern.

First, there is no support in the record for the vocational review's "wage requirement," calculated at 60%. Defendant admits that the Plan does not provide for such a 60% wage requirement, rather this was the "default" percentage used at the time by LINA. However, defendant points to no evidence in the record to support this default percentage, and the Court must disregard this argument. *See, Moon*, 405 F.3d at 378-79 (limiting court's review of the record as it existed on the date the administrator made its decision). In addition, LINA's decision to apply this wage requirement is not rational in light of the plan provision that provides that benefits can be terminated if the plaintiff earns over 80% of his indexed earnings. (AR 574.) *Shelby Cnty. Health Care Corp.*, 203 F.3d at 933-34 (administrator's decision must have been rational in light of the plan provisions). This is the only mention in the Plan of a "wage requirement." Nothing in the Plan can be reasonably interpreted to impose a 60% wage requirement. *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 557 (6th Cir. 1998) (holding that common law of contracts requires a reasonable interpretation of Plan terms).

25

Further, LINA failed to explain its basis for rejecting the limitations described by Neubert's treating physician. "Generally speaking, a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion." *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006). The vocational review identifies three occupations that are classified as light duty work, 20 C.F.R. § 404.1567(b), despite Dr. Shah's report that Neubert is only occasionally able to walk or stand, which would indicate sedentary work, 20 C.F.R. § 404.1567(a). In its first denial letter, LINA does not explain the discrepancy between Dr. Shah's analysis and that of the vocational review. What is more, the vocational review indicates, "no consideration [was] taken for any cognitive deficits"(AR 699), presumably, because Dr. Swales did not find any cognitive impairment; however, as outlined above, no explanation is given for rejecting the differing conclusions reached by Neubert's treating physicians. In light of the foregoing, the Court concludes that LINA's reliance on the TSA weighs in favor of finding its decision was arbitrary and capricious.

In light of the factors weighing in favor of finding an arbitrary and capricious decision at this step of the review process, the Court concludes that LINA's first denial of benefits was not the product of a deliberate, principled, reasoning process.

### 3.  Second Denial of Benefits

On November 23, 2009, LINA affirmed its previous denial of Neubert's claim, stating that, upon review of his claim file and the results of an independent peer review, "the documentation provided for review does not show any measured limitations that would support off work restrictions from February 20, 2009 forward. (AR 150-51.) LINA stated that numerous clinic visits found no residual effects from his strokes except for "possible patch decreased

sensation" in his right arm and "burning pain" on his right side. (AR 151.) LINA acknowledged Neubert's reported anxiety but cited the results of Dr. Swales's examination, which found no cognitive limits, and the report of its peer reviewer that Neubert was not suffering from "global impairment in neuropsychological functioning. (*Id*.) LINA concluded that based on the "results of the medical reviews of Neubert's physical and mental health conditions, the records on file do not provide medical documentation to support the severity of any of his conditions or impairment of his functional abilities that would prevent him from performing any occupation as the results of the Transferable Skills Analysis of February 2009 remain valid." (*Id*.)

Neubert asserts that LINA's second decision to deny him LTD benefits was arbitrary and capricious for failing to give proper credit to his treating physicians, for failing to address the SSA's favorable benefits determination, for relying on internal file reviews not based on substantial evidence and tainted by a conflict of interest, and for failing to explain or give reasons why the records supplied were insufficient to support a disability finding. LINA contends that its decision to deny Neubert's appeal was supported by substantial evidence in the administrative record and was the product of a reasoned, deliberate analysis of Neubert's entire claim file. LINA concedes that all of Neubert's treating physicians opined that he could not return to work, but contends that its reliance on the opposing views of its file reviewers was not arbitrary and capricious and that those opinions demonstrate that reasonable minds may differ as to Neubert's ability to return to work. Further, LINA argues that it was not arbitrary and capricious to require Neubert to provide objective medical evidence of his claimed disability and to deny his claim when he failed to produce such evidence.

Although a plan administrator, such as LINA, "may generally give weight to one doctor's opinion over another without acting arbitrarily or capriciously, 'a plan administrator may not arbitrarily disregard reliable medical evidence' offered by a claimant's treating physicians." *Mikolajczyk v. Broadspire Servs., Inc.*, No. 3:05CV7039, 2006 WL 2583391, at *14 (N.D. Ohio Sept. 6, 2006) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). When resolving conflicts between the opinions of treating physicians and its own file reviewers, a plan administrator must "provide[] reasons – including a lack of objective evidence – for adopting the alternative opinions that are consistent with its responsibility to provide a full and fair review" of the claimant's claim for benefits. *Curry v. Eaton Corp.*, 400 F. App'x 51, 60 (6th Cir. 2010); *see also Cooper*, 486 F.3d at 170 (noting that "conclusory and unsupported statements that the documentation of [the claimant's] functional capacity was insufficient to support a finding of disability" is not enough to support the denial of LTD benefits).

While the Sixth Circuit has held that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable[,]" *Cooper*, 486 F.3d at 166, a plan administrator cannot arbitrarily dismiss a treating physician's unwavering opinion of the importance of the claimant's reported stress or anxiety as an improperly documented, subjective, and irrelevant factor in its determination, particularly where the plan does not restrict the type of evidence that might be used to demonstrate total disability. *Glenn*, 461 F.3d at 672-73. *See also, Evans*, 434 F.3d at 879 (finding questionable an administrator's reliance solely on its own file reviews in light of critical credibility determinations, factual inaccuracies, and categorical dismissal of treating physician's reliable opinion regarding stress factor). "Nor may an administrator selectively choose only cumulatively favorable documents with which to conduct a

28

medical document review." *Mikolajczyk*, 2006 WL 2583391 at *14 (citations omitted). Additionally, when the conclusions of a plan administrator's own file review "include critical credibility determinations regarding a claimant's medical history and symptomology, reliance on such a review may be inadequate[,]" *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 297, n. 6 (6th Cir. 2005), especially where such "credibility determinations [are] made without the benefit of a physical examination." *Helfman v. GE Group Life Assurance Co.*, 573 F.3d 383, 395-96 (6th Cir. 2009) (citation omitted).

The Court concludes that Dr. Miller's file review was not the product of deliberate and reasoned analysis and was not supported by substantial evidence. Dr. Miller's opinion with respect to Neubert's physical restrictions concludes that Neubert's medical records lacked any measured limitations on his physical exams that would support off work restrictions. According to Dr. Miller, her conversation with Dr. Shah indicated that Neubert did not have any physical limitations or restrictions, but was unable to work due to anxiety and comprehension problems. Dr. Shah's alleged oral statements, however, contradict all of his prior written reports and statements, in which he clearly indicates that he believed Neubert was not able to perform any work. Further, there is an inconsistency between Dr. Miller's conclusion and the objective findings of Neubert's attending physicians, who noted that Neubert's fine motor skills are impaired and that he has decreased sensation and pain in his right arm and leg. Dr. Miller fails to explain adequately why she reached a decision contrary to the medical conclusions of all of Neubert's attending physicians who conducted physical examinations of him, and she offers no reason for rejecting the objective evidence presented. Instead, she conclusorily asserts that no objective evidence supports the limitations found by Neubert's treating doctors. Such a

29

"conclusory and unsupported statement[] that the documentation of [the claimant's] functional capacity [is] insufficient to support a finding of disability[]" is not enough to support the denial of LTD benefits. *Cooper*, 486 F.3d at 170.

        Moreover, by implicitly rejecting Neubert's subjective physical complaints, Dr. Miller made a critical credibility determination without the benefit of a physical exam. *Helfman*, 573 F.3d at 395-96. A file review based implicitly on such credibility determinations is further suspect where, as here, none of the treating physicians ever cited any concerns that Neubert was malingering. *Bennett*, 514 F.3d at 555 ("[W]e will not credit a file review to the extent that it relies on adverse credibility findings when the files do not state that there is reason to doubt the applicant's credibility.")

        Turning to Dr. Mendelssohn's file review with respect to Neubert's cognitive or neuropsychological condition, the Court concludes that it too lacks a reasoned analysis. Similar to Dr. Miller, Dr. Mendelssohn concluded, based on the records provided and a telephone conversation with Dr. Shah, that the clinical information did not "support the presence of a functional impairment from a neuropsychological perspective" and did not support off-work restrictions. (AR 465.) She concluded that the tests administered by psychotherapist Harold Schaus "did not substantiate [that Neubert] suffers from global impairment in neuropsychological functioning." (AR 465.) As with Dr. Miller, Dr. Mendelssohn discounted Neubert's reported cognitive difficulties, without the benefit of a physical evaluation, and rejected Dr. Shah's opinions based thereon, and Mr. Shaus's objective evaluation, concluding that Neubert's claim was not supported by objective medical evidence. Again, defendant points to a telephone conversation that Dr. Mendelssohn had with Dr. Shah in which she reportedly

indicated that Neubert did not have any overt cognitive deficits; however, Dr. Mendelssohn disregards other objective medical evidence in the record that supports a disability finding.

For example, Mr. Schaus concluded that Neubert suffered from deficits in divided attention in addition to anxiety, which rendered him unable to return to work. Dr. Mendelssohn does not refute these findings; instead, she questions Mr. Schaus's qualifications to administer the tests given and contends that he did not conduct any measure of Neubert's effort or motivation. (AR 464.) The record does not support these observations. For one, a review of Mr. Schaus's curriculum vitae (AR 540-42) indicates that he has collectively over fifty years of training and experience in the fields of psychotherapy, neuropsychology and neurotherapy. What is more, none of the physicians or professionals who examined Neubert, including Dr. Swales, concluded that he was malingering or questioned his motivation. Further, Mr. Schaus indicated in his report that Neubert was cooperative and gave a full effort on all tests and that validity checks built into the IVA test confirmed that Neubert's performance was valid.

Moreover, the "global impairment" standard applied by Dr. Mendelssohn is not defined in the record or the Plan. The Plan states that a participant is eligible for LTD benefits if "because of injury or sickness" he is "unable to perform all the material duties of any occupation [...]." (AR 571.) Nowhere in the Plan, is plaintiff required to prove that he suffers from a "global impairment." Application of this undefined standard weighs in favor of finding Dr. Mendelssohn's review was arbitrary and capricious. *See Shelby Cnty. Health Care Corp.*, 203 F.3d at 933-34 (administrator's decision must have been rational in light of the plan provisions). *See also, Elliott*, 473 F.3d at 620 (finding improper inquiry by file reviewer where term "sedentary work" appeared nowhere in the plan's terms).

31

In addition, insurance companies frequently employ Dr. Mendelssohn as a physician consultant. The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and to preserve their own consulting arrangements.'" *Black & Decker*, 538 U.S. at 832. Dr. Mendelssohn's conclusions have been questioned in at least three federal cases. *Smith v. Bayer Corp. Long Term Disability Plan*, 275 F. App'x 495, 506 (6th Cir. 2008) ("Mendelssohn's reference to the plaintiff's '*impairments* in the areas of communication, concentration, adaptability, and interacting with the public' […] significantly understates the clinical findings of a physician who personally examined the claimant.") (emphasis in original); *Weidauer v. Broadspire Servs., Inc.*, No. C-3-07-097, 2008 WL 4758691, at *15 (S.D. Ohio Oct. 27, 2008) ("Peer reviewer Dr. Mendelssohn concluded that there were no findings or observations to substantiate the presence of cognitive, emotional or behavioral impairments. Yet, there was."); *Carey v. Bellsouth Short Term Disability Plan*, No. 1:06-cv-2589-WSD, 2008 WL 178714, at *10 (N.D. Ga. Jan. 17, 2008) ("At least one of these peer reviewers—Dr. Mendelssohn—may have lacked objectivity, and, according to the uncontroverted affidavit of Dr. Grumet, Dr. Mendelssohn was unobjectively antagonistic to Dr. Grumet's diagnosis and opinion that Carey was disabled. This antagonism interfered with an objective, fact-based assumption of her condition."). The Court will not express an opinion on whether in fact Dr. Mendelssohn was influenced in this case by her frequent employment by insurance companies. It is clear, however, that she failed to conduct a full and fair review of Neubert's medical records by arbitrarily dismissing the objective findings of Mr. Schaus's testing and applying a "global impairment" standard not defined or supported in the Plan.

In light of the foregoing, the file reviews conducted by LINA do not support a finding that LINA engaged in a deliberate, principled reasoning process during Neubert's first appeal. The Sixth Circuit has made clear that an administrator abuses its discretion when it engages in a "selective review of the administrative record" to justify a decision to terminate coverage. *Moon*, 405 F.3d at 381. Here, LINA's file reviewers focused on portions of the record that could be read to support a denial of coverage, while ignoring those portions that did provide objective evidence of impairments. When an administrator "cherry-picks" the record in this fashion to support its decision to deny benefits, it abuses its discretion. *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265-66 (6th Cir. 2007). Further, although LINA was not required to give deference to the opinions of Neubert's examining physicians, its failure to review and refute fully his medical records and reports supports a finding that LINA's decision was arbitrary and capricious.

Finally, defendant's failure to consider Neubert's Social Security disability award also weighs against a conclusion that it engaged in a deliberate, principled reasoning process or that it conducted a full and fair review. While an ERISA plan administrator, such as LINA, is not bound by an SSA finding of total disability, *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005), it is inappropriate for a plan administrator to ignore an SSA determination contrary to its decision on disability. *Bennett*, 514 F.3d at 554. Especially, when the plan administrator both encourages and assists the claimant in applying for Social Security disability benefits and stands to financially benefit from the claimant's receipt of such benefits. *Id.* (citing *Glenn*, 461 F.3d at 669).

33

Here, LINA provided Neubert with assistance in obtaining Social Security disability benefits by referring him to Allsup, Inc. (AR 233.) Under the Plan, LINA was entitled to reduce the amount of benefits it paid to Neubert by the amount he received from Social Security. (AR 576.) In this regard, LINA sent Neubert a letter regarding a reimbursement agreement. (AR 980-81.) On November 2, 2009, Neubert notified LINA that the SSA had awarded him benefits, concluding that he was disabled because of cognitive impairments resulting from his stroke. (AR 596.) Later that same month, when LINA issued its second decision denying LTD benefits, it failed to explain why it reached a conclusion contrary to the concurrently rendered decision of the SSA and, in fact, did not even mention the SSA determination. Moreover, the record reveals that Dr. Mendelssohn's file review, which she completed after the SSA determination, also completely failed to discuss the contrary SSA decision, suggesting she had not engaged in a deliberate, principled reasoning process. *See*, *Bennett*, 514 F.3d at 554 ("silence as to the SSA's disability determination weighs in favor of finding that [it] failed to engage in a deliberate, principled reasoning process.") (internal quotation and citation omitted).

In light of the factors weighing in favor of finding an arbitrary and capricious decision at this step of the review process, the Court concludes that LINA's second denial of benefits was not the product of a deliberate, principled, reasoning process.

### 4.  Third Denial of Benefits

In its third, and final, denial letter, LINA stated it had completed another review of his file and would uphold its two prior decisions and would no longer pay benefits beyond February 9, 2009. (AR 142.) The letter quotes the applicable Plan definitions and states that

34

LINA conducted a complete review of Neubert's file. (*Id*. 142-43.) LINA states that it referred Neubert's file to its associate medical director, Dr. Scott Taylor, for a file review to "clarify Mr. Neubert's functionality." (*Id*. 143.) According to the letter, Dr. Taylor "noted that physical exams from Dr. Shah do not reflect sufficient physical deficits to preclude performance of sedentary activities [...]" and further noted that Dr. Shah "did not perform any documented testing to provide evidence that Mr. Neubert is unable to perform sedentary activities." (*Id*.) The letter states that Dr. Taylor also reviewed the reports of Dr. Swales, Mr. Schaus, and the previous two peer reviews and that he concluded that, "the medical records do not provide documentations of sufficient physical or cognitive functional deficits by clinically measurable testing to support restrictions from February 10, 2009 forward." (*Id*.)

Neubert asserts that LINA's third denial of benefits was also arbitrary and capricious. Specifically, he asserts that LINA did not conduct a full and fair review because it "cherry-picked" the record by not providing its assistant medical director, Dr. Taylor, with all of Neubert's medical records, including those related to his strokes; it ignored documented objective medical evidence of Neubert's impairments; and it failed to explain why the testing conducted was insufficient. Neubert also argues that LINA's decision was arbitrary and capricious because LINA again relied on a "global impairment" standard not defined in the plan and again ignored the SSA disability determination, which was resubmitted during the appeal process.

LINA contends that it reviewed Neubert's complete file and based its decision on a detailed analysis and review by Dr. Taylor, who found that the medical records did not provide clinical evidence showing that Neubert's functional capacity prevented him from continuously

performing any occupation. According to LINA, it provided Dr. Taylor with the *most relevant* medical evidence necessary for his review. With regard to any records not provided to Dr. Taylor, LINA asserts that he would have been aware of these records based upon his review of the two previous file reviews. Further, LINA argues that Dr. Taylor was not required to discuss each of the treating physician's findings, nor was he required to explain why he did or did not agree with their opinions. Finally, LINA notes that Dr. Taylor's review included the "fully favorable" SSA decision.

Because LINA's third denial suffers many of the same inadequacies as its previous denials, this Court concludes that it was not the product of a deliberate and reasoned decision-making process. As outlined above, the Sixth Circuit has emphasized that, while an administrator may give weight to one doctor's opinion over another, it "may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician." *Evans*, 434 F.3d at 877. Moreover, a plan administrator's explanation for adopting its file reviewer's opinion that disagrees with the conclusions of a treating physician is viewed with some skepticism when it is conducted by a doctor in the administrator's employ and is not based on an examination of the claimant, but upon a selective review of the record. *Evans*, 434 F.3d at 878. A plan administrator should provide its file reviewer "with all of the medical records relevant to [a claimant's] capacity to work." *Spangler v. Lockheed Martin Energy Sys, Inc..*, 313 F.3d 356, 362 (6th Cir. 2002). Further, "[t]he mere possibility that a participant in an ERISA plan might be able to return to some type of gainful employment, in light of overwhelming evidence to the contrary, is an insufficient basis upon which to support a plan administrator's

decision to deny that participant's claim for LTD benefits." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 170-71 (6th Cir. 2003).

Here, LINA's explanation for rejecting the treating physician's opinions is again that those opinions are not supported by objective medical evidence. Yet, in each step of the review process, neither LINA nor its file reviewers, including Dr. Taylor, ever refuted the objective medical findings of Mr. Schaus. Indeed, LINA's referral to Dr. Taylor included only one referral question that focused exclusively on Neubert's "physical limitations," despite his treating physicians' uniform opinions, and his consistent complaints, that he was suffering from cognitive deficits. Further, LINA admits that it did not provide Dr. Taylor with all of the medical records in Neubert's file, including those directly related to his strokes, which Neubert and his examining physicians have all asserted are the direct cause of his cognitive problems and his inability to work. LINA's determination that these records were not "relevant" was arbitrary and capricious. Moreover, LINA's referral asked Dr. Taylor to determine Neubert's ability to perform "any sedentary occupation," but the appropriate inquiry pursuant to the Plan was whether Neubert could perform any occupation for which he could reasonably become qualified based on his education, training or experience. The term "sedentary work" or "sedentary occupation" appears nowhere in the Plan, nor did LINA ever identify any sedentary jobs commensurate with Neubert's qualification. What is more, Dr. Taylor relied on the unsupported "global impairment" standard adopted by Dr. Mendelssohn in her review. Finally, Dr. Taylor's mere mention of the favorable SSA determination does not satisfy LINA's obligation to explain why it reached a contrary conclusion.

37

In light of the factors weighing in favor of finding an arbitrary and capricious decision at each step of the review process as discussed above, LINA's decision to terminate Neubert's LTD benefits must be **REVERSED**. In so doing, the Court **GRANTS in part** plaintiff's motion for judgment on the administrative record and **DENIES** defendant's motion for judgment on the administrative record.

## C. Remedy

Because the Court has determined that LINA's decision to deny Neubert LTD benefits was arbitrary and capricious, the Court must now determine the proper remedy in this case: retroactive reinstatement of benefits or remand to the administrator for a renewed evaluation of Neubert's case. *Shelby Cnty. Health Care Corp. v. Majestic Star Casino, LLC,* 581 F.3d 355, 373 (6th Cir. 2009) (citation omitted). The Sixth Circuit has recognized that the "appropriate remedy generally is remand to the plan administrator" where the " 'problem is with the integrity of [the administrator's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled.'" *Elliot,* 473 F.3d at 622 (citing *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31-32 (1st Cir. 2005)). "In other words, remand is appropriate where 'the adequacy of claimant's proof is reasonably debatable.'" *Edwards v. Life Ins. Co. of N. Am.*, No. 3:07-CV-247, 2009 WL 693139, at *23 (E.D. Tenn. Mar. 13, 2009) (quoting *Cooper*, 486 F.3d at 172). An immediate award of benefits is generally not appropriate unless a claimant's disability "is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." *Daft v. Advest, Inc.,* 658 F.3d 583, 595 (6th Cir. 2011) (quoting *Tate v. Long Term Disability Plan for Salaried Emps. Of Champion Int'l Corp. No. 506*, 545 F.3d 555, 563 (7th Cir. 2008) (internal quotation marks

38

omitted), *abrogated on other grounds by Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149 (2010)). *See also*, *Kalish*, 419 F.3d at 513 (concluding that where claimant has clearly established that he or she is disabled, the appropriate remedy is an immediate award of benefits rather than a remand to allow the plan administrator to consider evidence that it previously ignored).

In this case, although the Court has determined that the integrity of LINA's decision-making process itself was questionable, the Court concludes that Neubert's proof of disability is reasonably debatable and does not establish that he is *clearly* entitled to LTD benefits. Accordingly, the Court concludes that the appropriate remedy is to remand this case to LINA to provide a *de novo* consideration of Neubert's LTD claim consistent with this opinion. This course is strongly supported by Sixth Circuit precedent. *See*, *Hunter v. Life Ins. Co. of N. Am.*, No. 10–1244, 2011 WL 2566357, at *8 (6th Cir. June 29, 2011) (remanding to plan administrator despite "significant evidence" supporting disability and plan administrator's arbitrary and capricious decision-making process, where plaintiff was not "clearly entitled" to benefits); *Helfman*, 573 F.3d at 392-96 (remand appropriate where court is unable to say with certainty that claimant is clearly entitled to benefits); *Elliot*, 473 F.3d at 622-23.

## III.    CONCLUSION

For the reasons set forth above, plaintiff Neubert's motion for judgment on the administrative record is **GRANTED in part**, and defendant LINA's motion for judgment on the administrative record is **DENIED**. This case is **REMANDED** to LINA for a "full and fair review" of its decision to deny benefits; and this action is **DISMISSED**. On remand, LINA

should thoroughly review all available evidence regarding Neubert's claim for benefits and, after a full and fair inquiry, clearly detail non-arbitrary reasons for its benefits decision.

**IT IS SO ORDERED**.

Dated: March 8, 2012

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**